**ARONSON, Exr., Plaintiff-Appellant, v. THE INDUSTRIAL COMMISSION, Defendant-Appellee.**

Ohio Appeals, Seventh District, Mahoning County.

No. 2987.   Decided April 13, 1945.

Marvin Traxler, Youngstown, for Plaintiff-Appellant.

Thomas J. Herbert, Attorney General, Robert E. Hall, Assistant Attorney General and Alvy T. Witt, Assistant Attorney General, Columbus, for Defendant-Appellee.

## OPINION

By PHILLIPS, J.

Plaintiff appeals to this court on questions of law from a judgment of the court of common pleas entered upon a directed jury verdict for the defendant in plaintiff's action on appeal to that court to determine his right, as executor of the estate of Josephine Hollowell, to participate in the Workmen's Compensation Fund of Ohio, as the result of the death of decedent's husband Roy Hollowell.

Josephine Hollowell was the wife of Roy Hollowell and was wholly dependent upon him for support at the time of his death.   After Hollowell's death she duly filed her application for compensation with defendant, which was disallowed.   The subsequent necessary procedural steps were

taken, and from a final disallowance of her claim on rehearing, her appeal was perfected to the court of common pleas.

The record discloses that Roy Hollowell was a structural iron worker, a "bridgeman" employed by The Hunter Construction Company, a corporation "amenable to the workmen's compensation law of Ohio;" that on May 31, 1936, he was so employed and together with "about six or seven" other men was engaged in repairing empty "core bin No. 3" which was one of a series of open stock bins that supplied a blast furnace at the Campbell Works of the Youngstown Sheet and Tube Company; that the bin was about 35 feet deep, "about thirty-five feet wide" and "about twenty-two feet" long and was connected with a "walk-way" above by a ladder; that it was situated about 75 feet away from the blast furnace that it supplied which was "dead," and which for sometime prior thereto had not been in operation; that that blast furnace was one of a series of four such furnaces situated about one hundred feet apart; that the other three blast furnaces were in operation, and the one of those nearest the bin in which Hollowell was working was about seventy-five feet distant; that an airway and conveyor ran underneath the series of bins, in one of which Hollowell was working; that thirty-five or forty other men were working in that vicinity; that "there's always a certain amount of gas in a blast furnace"; that gas accumulated in pockets in those bins; "that there was a certain amount of gas everyday in those bins," which was noticed "on that particular day"; that there were "gas fumes" there, "I smelled it"; that two of Hollowell's fellow workmen quit "on that account"; that "carbon monoxide gas is one of the combustion gases that is commonly found in a furnace" (we assume the witness meant a blast furnace); and that "the authorities claim that one-tenth of one percent adulteration of normal atmosphere with carbon monoxide poisoning is capable of acute poisoning."

Also there is evidence that Hollowell was sick "about two weeks before he died. He had a cold"; that his wife said to him "daddy you had better get a doctor"; that he replied "no I'll be alright"; that subsequently his doctor diagnosed his illness as "acute tracheal bronchitis," from which he had recovered before he died; that there were "no complaints of a cardiac nature"; "that you will find a heart ailment ninety percent of the time" clinically; that "you got to have some laboratory work in the other then" which work he did not have done in Hollowell's case; that Hollowell's symp-

toms "were all respiratory" on the two days his physician saw him; that a policy of insurance was issued on his life a week prior to his death; that he worked the entire day before he died and "his spirits" were "all right" the night before he died; that on the day of his death Hollowell worked approximately an hour and a quarter in the bin at a depth not stated in the record, but that one of his fellow workers, "was way on top and he (Hollowell) was ten feet lower in the hopper"; that immediately before reaching the "walk way" he climbed a ladder a distance varying between ten and thirty-five feet.

One witness testified that "Roy came up the ladder and I happened to be on the walk-way at the time, on the top of the bin, and he said, 'For God's sake, catch me, I'm going to fall!' and another fellow and I got him and laid him on the walk-way and I don't know if he died then or on the way to the hospital."

The record discloses that plaintiff's physician witness "who didn't see this Roy Hollowell," but who was requested to and did "make an investigation of the effects of monoxide gas in relation to poisoning" was asked the following hypothetical question:—

"Now, Doctor, assuming that a man is working in a bin approximately thirty to thirty-five feet deep, and under these bins there is a tunnel from an opening under the bin extending under other bins to a blast furnacee a distance of about seventy-five feet, and which was in operation at the time, and that Roy Hollowell was employed in this bin seventy-five feet from the operating blast furnace, had worked there for an hour or two hours that morning, and several other workmen had noticed gas in the bottom of these bins, and suddenly Roy Hollowell became ill and crawled up a ladder a distance of thirty or thirty-five feet to the top of this bin, and shortly after arriving at the top he collapsed and died within a matter of minutes; what would you say, in the face of the evidence of gas being present in the bins as to whether his death could have been caused by this gas? I might also add, Doctor, that in making your answer to answer it in your own way."

Counsel for defendant objected. The referee sustained the objection. Counsel for plaintiff excepted and proffered the following answer:—

"Under the conditions described, with the presence of gas in a deep bin of the nature described, which was—, or which had direct communication with a blast furnace in active operation, the gases coming from the furnace creep along the ground, because it is known that carbon monoxide gas being heavier than air, stays at the bottom of any container in which there is atmosphere or air, and creeps along the floor of such a container, so that a person who would be at the bottom of such a bin would gradually be in contact with more and more gas as it displaces the normal atmosphere upwards. As the amount of carbon monoxide increases, and as the interval in which the individual is in this contaminated atmosphere, the poisoning of the individual is rapidly progressive so that he manifests a toxic condition which shows itself in marked weakness, air hunger, nausea, rapid pulse and cyanosis of the tissues. The individual realizes that he is becoming short of breath, that his pulse is hammering, and that he is becoming sick, and therefore attempts to leave the vicinity of the poisoned atmosphere. The exertion required to climb a ladder approximately thirty feet could and probably would be the deciding factor in further weakening an already weakened heart and usually results in an acute dilatation of the heart, which, in itself, is rapidly fatal, or, if an acute dilatation does not develop, the death, it may occur from the poisoning from the gas itself; therefore, the individual here concerned could have, and probably did die from the results of the carbon monoxide poisoning to which he was subjected in the body."

Counsel for defendant moved to strike the answer "from the record."

The referee reserved "ruling on the motion to strike with exceptions to either party."

The record does not disclose whether the referee ever ruled upon such motion or what disposition the judge of the court of common pleas made of the objection or motion.

Later counsel for plaintiff asked the same witness about "the outward physical appearance of the skin after death following poisoning by monoxide gas." His answer was "the body is cyanotic," "a bluish color."

Immediately thereafter plaintiff's counsel asked the same witness "so that if Roy Hollowell, when brought to the hospital of The Youngstown Sheet and Tube Company was found to

present a bluish gray color, with the history of the position he was in at the time the attack was first noticed by him, what would you say in the face of that bluish gray color as to what was the cause of death?"

The record discloses that counsel for defendant objected and in the opinion of a majority of the court the referee correctly ruled:—

"I sustained the objection. The rehearing evidence does not disclose any evidence on the subject included in this question."

Counsel for plaintiff excepted and proffered the following answer:—

"Under the circumstances I would say carbon monoxide poisoning."

No death certificate was introduced in evidence showing the cause of Hollowell's death.

It is the contention of the plaintiff that Hollowell's death was directly and proximately caused by a traumatic injury arising out of his employment and as the result of inhaling carbon monoxide gas.

Defendant contends that there is no evidence of traumatic injury; that to arrive at the conclusion that Hollowell died of an accidental injury resulting from inhaling carbon monoxide gas an inference must be based upon an inference.

The objection to the question cited first was properly sustained for the reason, among others possibly recited in a concurring opinion, that there is no evidence that Roy Hollowell "suddenly" "became ill" before crawling up the ladder. The question asked was whether "his death could have been caused by this gas."

"The testimony must establish a probability, not a mere possibility, of such causal connection" between such injury and death. See **Drakulich v Industrial Commission, 137 Oh St 82.**

It is clear that the question was not based upon facts, disclosed by the record, and it is obvious that the proffered answer was not based upon the facts assumed in the hypothetical question asked even though that question was based upon facts in evidence. Without the cited answers of plaintiff's physician witness to the stated hypothetical questions

there is no evidence of probative value warranting submission of plaintiff's case to the jury.

In the case of **Industrial Commission v Roth, 98 Oh St 34,** 120 N. E. 172, Roth, a common laborer, in obedience to orders from his employer, heated paint in a closed room, preparatory to painting, and inhaled the fumes therefrom WHICH CAUSED HIS DEATH.

"Where it is disclosed by the evidence that a workman, in the course of his employment, was subjected to unusual emission of carbon monoxide gas upon two specific occasions, and that his disability and death resulted therefrom, an award of compensation under the Workmen's Compensation Act will be sustained." **Industrial Commission v Palmer, 126 Oh St 251.**

"The record shows that the decedent was subjected continually to the emissions of carbon monoxide gas. The bake ovens which Palmer tended were in a room in which for a long period of time during his employment no ventilation whatever was permitted; and raw charcoal was ignited for the purpose of securing the heat required." Industrial Commission v. Palmer, supra.

In Industrial Commission v. Palmer, supra, the Supreme Court said:—

"If this were all the testimony upon the point that the decedent was subjected to emissions of carbon monoxide gas, and if there were not evidence in the record of unusual emissions of gas upon certain specific occasions, recovery would have to be denied under the authority of the Ohio decisions previously cited." (See cited case for such citations.)

" 'The inhalation by an employee of poisonous fumes, gas, or other harmful elements as a result of unusual conditions connected with the employment or under unusual circumstances, and not as an ordinary or reasonably-to-be-anticipated result of pursuing the work, resulting in disability or death, constitutes a compensable injury under the statute.' 42 O. Jur. 649, §64." **Krull v Industrial Commission, 68 Oh Ap 203 at 210.**

The record in that case reveals:—

"* * * that to accomplish the welding of the leaking air-conditioning unit, it was necessary, during the greater part of the time on the first day, for Krull to use a mirror to see,

and it was necessary for him to bend down close to and under the part of the unit upon which he was working, which was situated in a room with no outside ventilation and ventilated only by two small fans situated eight or ten feet away. Krull was not aware or not advised and had no reason to anticipate that all of the "Freon 12" (gas) which is was testified was lethal to some persons and harmless to others, had not been removed from the unit."

The doctor who signed the death certificate in that case testified that decedent died of "gas poisoning from fumes of a refrigerator repair," of "some intoxication, some toxemia, some variety of poisoning, the nature of which" he couldn't say.

It is believed that the facts in Industrial Commission v. Roth and Krull v. Industrial Commission, supra, cited by counsel for plaintiff distinguish them from the case at bar, and that Industrial Commission v. Palmer and other cases cited by him, but not reviewed herein, and upon all of which counsel relies to secure a reversal of the judgment of the court of common pleas, are not helpful to plaintiff.

While urging that there are other errors apparent upon the face of the record, counsel for defendant has not argued nor directed our attention to any. Accordingly we do not pass upon that assigned ground of error.

Defendant has not questioned plaintiff's right to establish his case medically by a hypothetical question, and we do not pass upon that question.

It is apparent from what has been said that a majority of the court reaches the conclusion that the judgment of the court of common pleas is not against the manifest weight of the evidence or contrary to law as urged by counsel for plaintiff and accordingly must be and hereby is affirmed.

CARTER, J, concurs in Judgment.
NICHOLS, PJ, dissents.

NICHOLS, PJ, dissents.
In my judgment the record presents evidence requiring the pertinent issue of fact to be presented to the jury.